[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10444
_____

D.C. Docket No. 3:07-cv-00474-SLB-JEO

ALONZO LYDELL BURGESS,

Petitioner – Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.
_____

Appeal from the United States District Court
for the Northern District of Alabama
_____
(July 30, 2013)

Before BARKETT, WILSON and MARTIN, Circuit Judges.

BARKETT, Circuit Judge:

Alonzo Lydell Burgess, an Alabama prisoner under sentence of death,

appeals the district court's order denying his 28 U.S.C. § 2254 petition for a writ of

habeas corpus, as well as the district court's order denying his Federal Rule of

Civil Procedure 59(e) motion to alter or amend that denial.  The district court rejected, without conducting an evidentiary hearing, Burgess's claim that he is mentally retarded[1] and that the Eighth Amendment to the United States Constitution categorically bars his execution pursuant to Atkins v. Virginia, 536 U.S. 304, 321 (2002).  The district court also rejected Burgess's claim that his trial counsel was ineffective in investigating, preparing for, and presenting mitigating circumstances related to his mental health in the penalty phase of his trial.  After a thorough review of the record and oral argument, we reverse the district court's ruling as to Burgess's Atkins claim and remand for an evidentiary hearing.  Because we remand to the district court as to Burgess's mental retardation, we need not resolve his claim of ineffective assistance of counsel.  Conner v. Hall, 645 F.3d 1277, 1294 (11th Cir. 2011).

## I.    PROCEDURAL AND FACTUAL BACKGROUND

Burgess was convicted of capital murder on March 1, 1994, for the murders of his girlfriend and two of her children.  The jury recommend by a vote of 8 to 4 a

---

[1] In referring to "mental retardation" throughout this opinion, we recognize that increasingly professionals in this field, such as the American Association on Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation), are replacing the term "mental retardation" with "intellectual disability" or "intellectual developmental disability."  In this opinion, however, we use the term "mental retardation" to maintain consistency with the terminology used throughout Burgess's appeal and relevant precedent.

2

sentence of life without parole, but the trial court rejected the jury's recommendation and sentenced Burgess to death on March 21, 1994. Burgess's conviction and sentence were affirmed on direct appeal. See Burgess v. State, 723 So. 2d 742 (Ala. Crim. App. 1997), aff'd, 723 So. 2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052 (1999).

Burgess subsequently sought post-conviction relief pursuant to Alabama Rule of Criminal Procedure 32 in March, 2000, arguing, inter alia, that his trial counsel was ineffective for failing to adequately investigate and present evidence relating to Burgess's mental health. During the penalty phase of Burgess's trial, the defense introduced some evidence regarding Burgess's mental health as part of its theory of mitigation, focusing on his mental disorder and the history of mental illness in his family. At the time that Burgess filed his Rule 32 petition on March 15, 2000, the Supreme Court had not yet granted certiorari in Atkins, and so while Burgess's petition and his subsequent requests for funds to hire mental health experts did express the need for further expert evaluation—including the need to "prescribe the appropriate psychological testing" to determine the existence of disabilities and to document them—the petition did not, of course, reference Atkins.

However, shortly before the hearing on Burgess's Rule 32 petition was to take place, the Supreme Court granted certiorari in Atkins and Burgess then sought

3

to amend the petition to specifically reference the Eighth Amendment claim that he could not be executed because he was mentally retarded.  He also asked the trial court for funds to retain a mental health expert and asked that mental health experts be granted access to him to conduct examinations.  The state trial court denied both motions, and no hearing was ever held on the Eighth Amendment claim, as the Alabama trial court found that claim to be procedurally defaulted.  Burgess v. State, 962 So. 2d 272, 298 (Ala. Crim. App. 2005).   Thus, the state trial court never considered the substance of Burgess's Eighth Amendment Atkins claim.

The Alabama Court of Criminal Appeals reversed the trial court ruling on procedural default recognizing that "the decision in Atkins . . . applies retroactively to cases that are on collateral review." Burgess, 962 So. 2d at 299 (quoting Clemons v. State, 55 So. 3d 314, 319 (Ala. Crim. App. 2003)).  However, the Alabama Court of Criminal Appeals rejected Burgess's argument that "now that Atkins has declared unconstitutional the execution of the mentally retarded," he should be permitted to develop "the record on [his] mental retardation."  Burgess also argued that the trial record indicated that he was mentally retarded, but that he was "prevented from adequately developing these claims during his Rule 32 hearing by the [trial c]ourt's denial of his ex parte applications for funds for expert assistance" and the denial of his motion for experts to obtain access to him in the prison, "which prevented him from utilizing any expert that could have been

4

procured independently of state funds." The Alabama Court of Criminal Appeals denied Burgess's Eighth Amendment claim on the merits, based solely on the paper record from pre-Atkins proceedings, and said that he was not mentally retarded. Id. Burgess sought rehearing in the Alabama Court of Criminal Appeals, and the ruling was affirmed. Burgess, 962 So. 2d at 301. The Supreme Court of Alabama, to whom Burgess also argued he should be allowed to adequately develop the record on his mental retardation claim, denied certiorari. Ex parte Burgess, # 1050290 (Ala. Feb. 23, 2007). Burgess then sought a writ of Habeas Corpus in Federal District Court for the Northern District of Alabama. The district court denied Burgess's request for a hearing on his Atkins claim, and denied his petition in full.

Because our review of the decisions of the Alabama Court of Criminal Appeals and the district court requires a careful understanding of the evidence presented and the arguments Burgess advanced at each state of the proceedings, we will discuss each stage in greater detail before addressing the merits of Burgess's appeal.

A. *Evidence Presented During the Penalty Phase*

The sole defense witness to testify during the penalty phase of Burgess's trial was Dr. John Goff, a neuropsychologist. The thrust of Dr. Goff's testimony was that he had diagnosed Burgess as suffering from a "cyclothymic disorder," less

severe than bi-polar disorder but reflecting "that the patient has a substantial problem with fluctuating moods, going from episodes of elation and over stimulation, to episodes of being profoundly depressed." However, in the course of his testimony Dr. Goff repeatedly indicated that his own assessment of Burgess had been difficult. He had met with Burgess for five hours, during which time he found it difficult to communicate with Burgess, whom he described as being in a manically excited state. He also repeatedly described the "collateral evidence" of Burgess's educational and familial history as "sparse." He cursorily stated that Burgess's mother suffered from mental illness, that he had a dysfunctional family life, that at least one of his uncles beat him on a regular basis, that he had mentally retarded family members, and that he did poorly in school. Burgess's school records were also introduced into evidence, demonstrating his poor academic performance over the course of his life: his need to repeat the first grade, his eventual placement into special education classes where he continued to do extremely poorly, and leaving school after the completion of the ninth grade with all failing grades with the exception of one D.

As to Burgess's intellectual functioning, Dr. Goff explained that he had conducted no investigation into the matter and administered no intelligence testing. Rather, Dr. Goff testified that he had read the reports of a Dr. Shealy, an expert for the defense, and a Dr. Maier, an expert for the state. Dr. Shealy's report indicated

that he administered intelligence testing after Burgess's arrest, from which he

concluded that Burgess was "borderline mentally retarded."[2] Dr. Goff also read

into the record portions of a report written by Dr. Maier, who examined Burgess on

behalf of the state.  Dr. Maier did not report having administered any IQ testing,

but rather "estimated" that Burgess's intelligence was "below normal probably in

the borderline range, IQ estimate somewhere between 70 and 80."  Dr. Maier

further reported that Burgess "may even be mildly mentally retarded," and found

this to be consistent with Burgess's "very limited educational and/or vocational

achievements."

### B.  The State Collateral Proceedings

Prior to his Rule 32 evidentiary hearing, Burgess sought funding for a

mental health expert and a neurologist or neurobiologist, as well as permission

from the court for experts to obtain access to the prison where he was incarcerated

so that a mental health expert could "prescribe the appropriate psychological

testing to determine the existence of any disabilities and, if they exist, to document

them."[3]   He argued that the claims related to his mental health required the

presentation of additional expert evidence that was not developed at trial, and that

---

[2] Dr. Goff did not testify as to the numeric score Dr. Shealy obtained, which was a Wechsler Adult Intelligence Scale-Revised (WAIS-R) IQ score of 66.

[3] Burgess needed a court order for mental experts to enter Holman state prison, where he was housed, because the prison would not permit psychologists, psychiatrists, or other mental health professionals to evaluate him without one.

without access to experts he would be prevented from developing the proof of his claims at the state collateral evidentiary hearing. The state opposed Burgess's motions seeking to further develop the record, arguing that further mental health evaluations were not necessary because Burgess already had three mental health evaluations by the time of his trial. As noted, those experts conducted almost no inquiry into whether Burgess was mentally retarded. The trial court denied his requests for funds for experts, and also denied his request that experts be granted access to him for the purpose of conducting further mental health evaluations.

Also prior to his Rule 32 evidentiary hearing, in response to the granting of certiorari in Atkins, Burgess filed an amended petition including a claim that the Eighth Amendment barred his execution because of his mental retardation.[4] The Rule 32 evidentiary hearing was conducted on February 25, 2002, four months before the Supreme Court issued its opinion in Atkins. Shortly before the evidentiary hearing on February 25, in response to the trial court's request that the parties indicate their positions on the issues set for the hearing, Burgess's counsel submitted a letter to the trial court stating,

> I would like to emphasize that those claims raised in Mr.
> Burgess's Rule 32 petition that require the presentation
> of additional evidence are largely built around the need

---

[4] In his amended petition Burgess requested (1) "a full evidentiary hearing at which [he] may offer proof concerning the allegation of [the amended] petition" and (2) that the court "provide [him] . . . with sufficient funds to present . . . experts, and other evidence in support of the allegations in his petition."

8

for appropriate expert assistance which was not developed at trial. Since this Court has denied Mr. Burgess's motions for funds to procure such expert assistance, Mr. Burgess is prevented from developing many of his claims at the evidentiary hearing.

As noted, the state consistently opposed Burgess's requests to obtain further expert evaluation, arguing that the prior evaluations of Drs. Goff, Shealy, and Maier, were sufficient. As the trial court had already denied Burgess's motions to present new mental health evidence, Burgess was then left with resting his claim on the evidence already in the record. Thus, at that hearing, no evidence was presented as to Burgess's Eighth Amendment claim. The Supreme Court issued its opinion in Atkins in June 2002, and six months later, in its January 1, 2003 opinion, the trial court rejected Burgess's Atkins claim as procedurally defaulted and dismissed the claim without addressing its merits. See Burgess, 962 So. 2d 272.[5]

In his first court filing following Atkins, Burgess appealed the denial of his Rule 32 petition to the Alabama Court of Criminal Appeals, again asserting that his execution was barred by the Eighth Amendment and that his counsel was ineffective in failing to present the evidence sufficient to establish this fact. In addition to arguing as best he could that the existing record evidence nonetheless established that he was mentally retarded, Burgess also argued that the trial court's

---

[5] The trial court also denied relief as to Burgess's ineffective assistance of counsel claim. See id. at 286-94.

9

denial of his request for funds for expert assistance, as well as precluding mental health experts from obtaining access to him in prison, "prevented [him] from adequately developing [this claim] during his Rule 32 hearing."  He further maintained that "now that Atkins has declared unconstitutional the execution of the mentally retarded, this Court must permit the development of the record on Mr. Burgess's mental retardation."

Although the Alabama Court of Criminal Appeals ruled that the circuit court erred in finding Burgess's Atkins claim defaulted, it denied his claim on the merits, stating that after reviewing the paper record there was "no indication that Burgess meets the definition of mental retardation adopted by the Alabama Supreme Court in Ex parte Perkins, 851 So. 2d 453 (Ala. 2002)."  Burgess, 962 So. 2d at 299. Perkins held that to be considered mentally retarded for purposes of the Eighth Amendment's prohibition on execution, a defendant "must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior.  Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reach age 18)."  851 So. 2d at 546.

The basis of the Court of Criminal Appeals ruling was a "finding" that Burgess's IQ was between 70 and 80, as well as findings that: Burgess had completed the ninth grade; had completed one year at a training school; worked as

10

a welder while incarcerated in Mississippi; was cooperative when interviewed by a probation officer; was a "normal child who was considerate, compassionate, and caring;" had a brother who was mentally retarded;[6] and had been in a relationship with the victim. Burgess, 962 So. 2d at 299.

### C. Federal Habeas Proceedings

Burgess next filed a petition in federal court seeking a writ of habeas corpus. Before the district court, Burgess proffered an affidavit from Dr. Bryan Hudson, a neuropsychologist, containing new expert testimony related to his Atkins claim. After conducting testing and a thorough review of Burgess's history, he concluded "to a reasonable degree of psychological certainty that Mr. Alonzo Burgess is a mentally retarded person." The district court refused to consider this affidavit, or to grant Burgess an evidentiary hearing on his Atkins claim because, "[d]uring the

---

[6] As noted in the affidavit of Dr. Bryan Hudson, which Burgess asked the district court to consider, the fact that a family member suffers from mental retardation actually supports a finding of mental retardation in Burgess. Dr. Hudson's affidavit explains:

> Mr. Burgess's family history is consistent with several possible etiologies of mental retardation. His family history is positive for mental illness, cognitive and learning deficits. It has been reported that Mr. Burgess'[s] uncle, Billy is significantly limited, and may even be mentally retarded. Mr. Burgess'[s] uncle, Howard has two sons who are mentally retarded. In addition, Mr. Burgess'[s] son is mentally retarded . . . . To the degree that the early learning environment plays a significant role in the phenotype or genetic expression of factors related to the development of intelligence, Mr. Burgess was not afforded the exposures that would have been conducive to appropriate development of the likely attenuated biological template of intelligence with which he was born.

11

post-conviction proceedings, Burgess argued that all of the evidence necessary to support his mental-retardation claim was located in the trial court record, and he offered the trial court record as the sole support for his claim." Notwithstanding that Burgess had asked for and been refused funds to pay for a mental evaluation and been denied permission for experts to gain access to him in the prison in order to obtain and present evidence, the district court found that Burgess had "failed, without explanation, to develop and present [the affidavit] in the first instance to the state court." As to the state court's determination that Burgess was not mentally retarded, the district court found that, based on the trial record, "Burgess's IQ scores placed him in the category of borderline intellectual functioning or borderline mentally retarded," and that "the Alabama court's finding that Burgess was not mentally retarded is not an unreasonable finding based on the evidence."

## II.    DISCUSSION

### A. *Whether the Ruling of the Alabama Court of Criminal Appeals is Entitled to Deference under AEDPA*

The question before us is a narrow one. Specifically, we must decide whether the Alabama Court of Appeals erroneously determined that Burgess was not mentally retarded based upon only the record before that court. In reviewing a district court's denial of a habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error. Conner v.

12

Sec'y, Fl. Dep't of Corr., 713 F.3d 609, 620 (11th Cir. 2013). We review state court judgments under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Id. If the state court has adjudicated the merits of a claim, we may not grant habeas relief unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(e)(1), "for a writ to issue because the state court made an 'unreasonable determination of the fact,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence." Ward v. Hall, 592 F.3d 1114, 1155-56 (2010) (alteration in original). Although AEDPA review is highly deferential, "deference does not imply abandonment or abdication of judicial review." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

After careful review of the record before the state court, we disagree with the district court and hold that the ruling of Alabama Court of Criminal Appeals that Burgess is not mentally retarded was an "unreasonable determination of the facts" in this case. 28 U.S.C. § 2254(d)(2). In applying Atkins and the substantive test established in Ex parte Perkins, the critical underpinning of the Alabama Court of Criminal Appeals' decision was its conclusion that Burgess's IQ

13

was between 70 and 80.  Burgess v. State, 962 So. 2d at 299.  However, the record does not support this finding.  The only evidence considered as to Burgess's IQ was the testimony of Burgess's expert Dr. Goff and a Mississippi correctional record.  Dr. Goff testified that he had not conducted any intellectual testing on Burgess because he saw no need to duplicate the testing of Dr. Shealy who had found Burgess to be borderline mentally retarded.[7]  Dr. Goff also reported that the state's expert, Dr. Maier, "estimated" Burgess's IQ to fall in the 70 to 80 range.  Dr. Maier conducted no intellectual tests and there was no evidence introduced as to how this estimate was obtained.  Moreover, this "estimate" was further qualified by Dr. Maier's view that Burgess "may even be mildly mentally retarded," meaning that his IQ would be 70 or below.[8]  Finally, although a Mississippi state correctional record indicated that Burgess had an IQ of 73, like Dr. Maier's estimate, there was no explanation of how the score was obtained, of who had obtained and recorded the score, or why.  When the record provides both realistic indications that a defendant might be mentally retarded and no concrete, verifiable IQ score, it is an unreasonable determination of the facts for a court to rely instead

---

[7] As revealed in Dr. Hudson's affidavit presented to the district court, Dr. Shealy actually found Burgess to have a Wechsler Adult Intelligence Scale Revised (WAIS-R) IQ score of 66.

[8] The American Psychiatric Association explains that the term "mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.  Diagnostic and Statistical Manual of Mental Disorders 42-43 (rev. 4th ed. 2000).

14

on an "estimate" and equivocal statements to find as a fact that the defendant has an IQ of between 70 and 80.[9]

It is also impossible to reconcile with the record the Alabama Court of Criminal Appeals' finding that Burgess failed to demonstrate significant deficits in adaptive behavior. Citing to evidence presented in mitigation at trial which essentially amounted to "good character" evidence, the state court noted that Burgess labored as a welder while in Mississippi prison, that a prison guard described him as "industrious, orderly and obedient," that he was "cooperative" with a probation officer, that he reported working as a brick mason at some point in time, and that witnesses gave statements that he was a caring child. But this evidence was presented in an entirely different context and without the benefit of any explanation of how it would or would not be consistent with mental retardation, and therefore does not indicate anything substantive about Burgess's adaptive abilities as that term is used clinically. Nor does it take into account that even the state expert, Dr. Maier, specifically noted both that Burgess "may even be

---

[9] As the Supreme Court recognized in <u>Atkins</u>, mental retardation is fundamentally a "clinical" diagnosis. 536 U.S. at 308 n.3, 317 n.22, 318. Common sense dictates that any standard dependent upon an IQ score—a concept that does not exist outside the context of a medical examination—requires verifiable expert analysis and diagnosis. When given an opportunity at oral argument to explain how a defendant might go about proving his mental retardation without expert assistance, the state conceded: "Alabama does not . . . per se require an expert. However, I imagine it would be very difficult to carry your burden of proof without an expert . . . ."

mildly mentally retarded," and that that finding would be <u>consistent</u> with Burgess's poor adaptive skills: his poor school performance and his lack of vocational success.

While the Alabama Court of Criminal Appeals found that Burgess had completed ninth grade, and that this was evidence of healthy adaptive abilities, the record before them reflected a very different picture. While it is true that Burgess attended school through ninth grade, his performance was very poor: he repeated the first grade, usually received failing grades, and eventually was placed in special education classes where he <u>still</u> received failing grades. In ninth grade he received all F's but for a lone D. His standardized test scores reveal an even more striking picture, at times scoring as low as in the lowest 3% or 4% nationally. Thus, the evidence relied on by the state court in making its finding that Burgess did not demonstrate deficits in adaptive behavior either contradicted that finding or was presented in such a different context that it cannot meaningfully support the finding. See <u>Bobby v. Bies</u>, 556 U.S. 825, 836 (2009) (noting that a finding of mental retardation for <u>Atkins</u> purposes is a fundamentally different inquiry, guided by a distinct legal standard, than a finding of mental retardation for mitigation purposes).

Although the <u>Atkins</u> Court instructed states to develop standards for identifying mentally retarded defendants, it was also instructive regarding the

16

nature of the factual inquiry to be undertaken.  The Court explained that the reason those suffering from mental retardation should not be executed, even when they "meet the law's requirements for criminal responsibility" is "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses . . . they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct."  536 U.S. at 306.  The Court highlighted the fact that there is a difference between using mental retardation as a mitigating factor (a balancing inquiry) and categorically excluding mentally retarded persons from the death penalty altogether (a categorical prohibition) such that pre-Atkins it could have been detrimental to a defendant's case to present thorough evidence of mental retardation:  "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury."  Id. at 320-21.[10]  The Court reiterated the distinction between mitigation evidence and Atkins evidence in Bies: "Mental retardation as a mitigator and mental retardation under Atkins . . . are discrete legal issues."  556 U.S. at 836.  Consequently evidence presented pre-Atkins, may not

---

[10] The Court also noted that a defendant's mental retardation is likely to substantively impair their abilities to present a compelling mitigation case in the first instance: "The risk that 'the death penalty will be imposed in spite of factors which may call for a less severe penalty,' Locket v. Ohio, 438 U.S. 586 (1978), is enhanced . . . by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors.  Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses . . . ."  Atkins, 536 U.S. at 320-21.

17

in every case be conducive to an Atkins inquiry and may not enable a court to make reasonable factual determinations relating to mental retardation for the purposes of the Eighth Amendment.  Indeed, the Court remanded for a hearing on the question of whether Atkins was in fact mentally retarded for the purposes of the Eighth Amendment, even though a jury had already heard evidence regarding mental retardation during the penalty phase.  Burgess is entitled to the same relief.

The State argues that Burgess's Atkins claim is foreclosed by Carroll v. Sec'y Fl. Dep't Corr., 574 F.3d 1354 (2009).  We do not agree.  Burgess presents a different claim than that made in Carroll and the facts here are significantly different.  Carroll sought habeas relief on the grounds that his due process rights had been violated by the state's failure to conduct an evidentiary hearing on his Atkins claim in his state post-conviction proceedings, which it is well established will not support a claim for habeas relief.  Id. at 1365.  Although we noted in Carroll that Atkins does not "require state courts to conduct evidentiary hearings on every claim of mental retardation," Carroll, 574 F.3d at 1366 (emphasis added), that does not mean that in every case a pre-Atkins record will be sufficient to make a reasonable Atkins determination sufficient to survive review under § 2254(d)(2).  Prior to Carroll's request for a new evidentiary hearing, extensive evidence relating to his mental health, including the testimony of numerous experts directly addressing whether Carroll was mentally retarded, had already been presented in

18

three prior hearings.  574 F.3d at 1357-63. As explained supra, the pre-Atkins record in this case was inadequate to reasonably support the state court's findings. Further, unlike Burgess, "Carroll ha[d] never attempted to proffer any additional evidence to any court—whether it be the state courts, the district court, or this Court—that would undermine the exhaustive evidence already in the record indicating that he is not mentally retarded." Id. at 1368.  Thus, Carroll does not control this case.

The State also argues that, to the extent the record is insufficient, that insufficiency should be held against Burgess.  Under the narrow facts of this case, we cannot agree.  At the time of Burgess's trial, sentencing, and direct appeal, Penry v. Lynaugh, 492 U.S. 302 (1989), was the Supreme Court's guiding decision regarding evidence of a defendant's mental retardation.  Penry held that sentencers must be able to consider and give effect to evidence of a defendant's mental retardation for purposes of mitigation, but it also expressly recognized that "Penry's mental retardation . . . is . . . a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." Id. at 324.   Because evidence of mental retardation was a "two-edged sword" a defendant could reasonably decide not to highlight his mental retardation.  Cf. Bies, 556 U.S. at 836 (noting that "mental retardation as a mitigator and mental retardation under Atkins . . . are discrete legal

19

issues," and that "prosecutors, pre-Atkins, had little incentive vigorously to contest evidence of retardation" because such evidence could have been beneficial to the prosecution's case). The intervening decision in Atkins "substantially altered the [parties'] incentive[s]," id. at 837, regarding evidence of mental retardation such that it would be a gross inequity to hold Burgess to an undeveloped, pre-Atkins record. Cf. Williams v. Taylor, 529 U.S. 420, 437 (2000) ("[C]omity is not served by saying a prisoner has failed to develop the factual basis of a claim where he was unable to develop his claim in state court despite diligent effort."). Additionally, prior to Ex parte Perkins, there was no substantive legal standard for Burgess to argue he met, as Penry endorsed no specific definition of mental retardation and Alabama had not adopted a legal standard of its own.

Furthermore, contrary to the State's assertion that Burgess at all times maintained that the trial court record, standing alone, was sufficient to prove his Atkins claim, Burgess consistently argued that to fully litigate his claim additional expert evidence was required.[11] His arguments based upon the existing record were made only after his requests to expand the record were denied, and he clearly

---

[11] For example, in his brief before the Alabama Court of Criminal Appeals, the first of his post-Atkins filings, he argued that "thorough review by this Court is precluded due to the fatally incomplete and erroneous record on appeal." Noting that "[t]he services of mental health and neurological experts were sought to assist counsel and the court in discerning, documenting, interpreting, and presenting evidence in support of . . . his claim that his mental retardation renders him ineligible for the death penalty," he further argued that "[w]ithout the assistance of expert testimony during his Rule 32 hearing, [he] was prevented from adequately proving" his Atkins claim.

20

maintained before the Alabama Court of Criminal Appeals that "now that Atkins has declared unconstitutional the execution of the mentally retarded, this Court must permit the development of the record on Mr. Burgess's mental retardation." While the state was not required to grant Burgess's requests to obtain and present additional evidence, see Carroll, 574 F.3d at 1366, the insufficiency of the state record cannot now be held against Burgess in the context of a new rule of Constitutional law, made retroactive on collateral review, that was announced well after the trial record was complete and after Burgess had been denied the opportunity not only to have additional experts but also for any expert access to him while in prison.

We hold that the state court's determination that Burgess is not mentally retarded is an unreasonable determination of fact because it was based upon a combination of erroneous factual findings directly contradicted by the record and a record that was insufficient to support its conclusions. Accordingly, we vacate the district court's contrary finding and its denial of Burgess's petition.

### B. Whether Burgess was Entitled to an Evidentiary Hearing

Because we have determined that the finding by the Alabama Court of Criminal Appeals that Burgess is not mentally retarded is not entitled to AEDPA deference, the district court erred in deferring to that conclusion. Accordingly, we must address whether the district court also erred in refusing to hold an evidentiary

21

hearing.  Burgess argues that an evidentiary hearing was necessary for him to effectively present his Atkins claim.  Specifically, he argues that the district court erred in failing to consider the affidavit of Dr. Bryan Hudson and refusing to grant a hearing in which Dr. Hudson could testify.  28 U.S.C. § 2254(e)(2) prohibits a district court from holding an evidentiary hearing on a claim if the petitioner has failed to develop the factual basis for the claim in state court, absent certain narrow circumstances.[12]  However, because § 2254(e)(2) only prohibits hearings where the petitioner has "failed to develop" the factual basis in state court, if the petitioner was diligent in developing the record in the state habeas proceedings, "a federal court may grant an evidentiary hearing without further regard for the provisions of § 2254(e)(2)."  Ward v. Hall, 592 F.3d 1144, 1159 (11th Cir. 2010).

---

[12] 28 U.S.C. § 2254(e)(2) states in full:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

22

In a case where the petitioner has diligently attempted to present the factual basis for his claim, we then review the district court's denial of an evidentiary hearing in a habeas case for abuse of discretion. Schriro v. Landrigan, 550 U.S. 465, 473 (2007); see also 28 U.S.C. § 2254, Rule 8(a) ("[T]he judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted"). The district court abuses its discretion where "such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro, 550 U.S. at 474.

Here, Burgess was diligent in presenting his Atkins claim. As the Supreme Court has explained: "Diligence [for purposes of § 2254(e)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court," Williams v. Taylor, 529 U.S. 420, 435 (2000) (emphasis added), and "will require in the usual case that prisoner, at a minimum, seek an evidentiary hearing in state court," id. at 437. Prior to Atkins, Burgess sought to obtain and introduce additional evidence of his mental condition. As discussed above, prior to Atkins, Burgess could not have been expected to necessarily present evidence sufficient to support an Atkins claim because such evidence constituted a double edged sword and, further, because Alabama had no existing legal standard for mental retardation for Burgess to argue

23

he met.  The Atkins case itself was remanded for further findings as to whether Atkins was mentally retarded.  536 U.S. at 321.  Even though the state would not have been required to provide Burgess with funds for an expert, it also refused to allow access to Burgess for testing by any expert.

Once Atkins was decided, Burgess renewed his efforts to introduce additional evidence into the record.  He argued to the Alabama Court of Criminal Appeals that he could not fully litigate his Atkins claim without additional expert testimony and requested that he be allowed to present that testimony in the first instance.  The fact that at this point Burgess did not have an expert affidavit to proffer should not be held against him.  He had been denied his request to have any expert, even one procured independently of state funds, be allowed access to him for the purposes of conducting a full evaluation.  Despite this denial, the record was clear as to what type of evidence he sought to present: expert testimony by a witness who could conduct neurological and psychological testing and evaluate his mental health and intellectual functioning.   He continued to make this argument in his request for rehearing and in his application for certiorari to the Alabama Supreme Court.  The district court's finding that Burgess had not been diligent, ("Burgess failed, without explanation, to develop and present [expert testimony] in the first instance to the state court"), was clearly erroneous.  We note that other circuits have found that petitioners in similar positions to Burgess (petitioners

24

whose state collateral hearings were completed prior to Atkins but who raised colorable claims post-Atkins) were entitled to evidentiary hearings in federal court. See, e.g., Allen v. Buss, 558 F.3d 657, 661-65 (7th Cir. 2009); Hall v. Quarterman, 534 F.3d 365, 371 (5th Cir. 2008) ("The issue of mental retardation, defined by Atkins only after Hall was tried . . . is fact-intensive and rests on nuanced determinations under broadly stated concepts such as 'limitations in adaptive functioning.'  If Hall can prove the facts that he has consistently alleged on appeal, he will be entitled to habeas relief.").

The remaining question is whether a hearing could have enabled Burgess to prove his petition's factual allegations, and thereby entitled him to federal habeas relief.  We find that it could have.  As Atkins left to the states the task of developing their own standards for determining mental retardation, 536 U.S. at 317, it is Alabama's standard, announced in Ex parte Perkins, which governs Burgess's Atkins claim.  Thomas v. Allen, 607 F.3d 749, 752-53 (11th Cir. 2010).  As noted, Perkins held that a defendant alleging an Eighth Amendment mental retardation claim must show that he has significantly subaverage intellectual functioning (IQ of 70 or below), significant or substantial deficits in adaptive behavior, and that these problems manifested themselves during the developmental

25

period (before the age of eighteen).[13]  851 So.2d 453, 456 (Ala. 2002); see also

Thomas, 607 F.3d at 752-53.  Importantly, we have noted, that a range of scores,

some above and some below 70, will not necessarily preclude a finding that a

defendant is mentally retarded under Alabama law.  Thomas, 607 F.3d at 757.

In addition to the scant evidence already in the record, Burgess has now

proffered additional evidence in the form of an affidavit from Dr. Bryan Hudson,

which offers several key additions to the record.  First, Dr. Hudson provides an

analysis of Burgess's intellectual functioning.  Although he obtained a full scale

score of 76 on the Wechsler Adult Intelligence Scale-III test,[14] Hudson concluded

that after taking into account the "Standard Error Measurement"[15] and "Flynn

---

[13] Later, in Smith v. State, the Alabama Supreme Court added an additional element to the definition by stating that a defendant must exhibit significantly subaverage intellectual functioning abilities and significant deficits in adaptive behavior during three periods of his life: before the age of eighteen, on the date of the capital offense, and currently. __ So. 2d __, No. 1060427, 2007 WL 1519869, at *8 (Ala. May 25, 2007).

[14] "The two most widely recognized and utilized intellectual functioning assessment instruments are the Wechsler Adult Intelligence Scales ('WAIS') and the Stanford-Binet Intelligence Scales."  Thomas, 607 F.3d at 753.

[15] "When considering an individual's intellectual functioning test score, the evaluator may consider the Standard Error of Measurement ('SEM'), which is an index of the variability of test scores produced by persons forming the normative sample. In other words, the SEM is a statistical measure that allows the evaluator to know the amount of error that could be present in any test. The AAMR acknowledges that the SEM has been estimated to be three to five points for well-standardized measures of general intellectual functioning. Hence, the IQ standard score is bounded by a range that would be approximately three to four points above and below the obtained scores." Thomas, 607 at 753.  Here, Dr. Hudson stated that a SEM of five points would be appropriate, establishing a range of 71 to 81.

26

Effect"[16] Burgess's "true IQ" "would certainly fall in the range of mild mental retardation."[17]   He also explains how Burgess's limited intellectual functioning can be traced over time during the necessary life stages by looking at his family history, his school records, and prison records.  Second, Dr. Hudson provides expert analysis of Burgess's behavioral deficits, placing these deficits in context and explaining their significance.  Dr. Hudson concludes, based on an extensive review of Burgess's family and personal history, that Burgess "has demonstrated deficits in all three areas of adaptive behavior skills:" conceptual skills, social skills, and practical skills. Dr. Hudson also explains why Burgess's adaptive deficits might not have been apparent in all aspects of his life and why that fact would not call into question the diagnosis.  Finally, Dr. Hudson concludes, "[I]t is my opinion to a reasonable degree of psychological certainty that Mr. Alonzo Burgess is a mentally retarded person."  If the district court were to find Dr. Hudson's testimony to be credible, combined with prior record evidence, and Dr.

---

[16] "An evaluator may also consider the 'Flynn effect,' a method that recognizes the fact that IQ test scores have been increasing over time. The Flynn effect acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects. Therefore, the IQ test scores must be recalibrated to keep all test subjects on a level playing field." Thomas, 607 F.3d at 753 (citations omitted).  Here, Dr. Hudson stated that "when consideration is given to the Flynn Effect, I believe that his IQ would certainly fall in the range of mild mental retardation," which would be between 50-55 and approximately 70, see note 18 infra.

[17] As noted previously, the American Psychiatric Association explains that the term "mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.  Diagnostic and Statistical Manual of Mental Disorders 42-42 (4th ed. 2000).

27

Shealy's reported IQ score of 66 (which is contained in Dr. Hudson's affidavit), Burgess would be entitled to habeas relief.  It was therefore an abuse of discretion to deny Burgess's request for an evidentiary hearing, and we reverse the district court, and remand with instructions to grant Burgess's request for a hearing.

## III.    CONCLUSION

Having determined that we must vacate the district court's judgment denying Burgess's petition and remand for further proceedings on his claim of mental retardation, "it is unnecessary for us to decide anything regarding the [ineffective assistance of counsel] claim . . . .  Our remand is not limited but is instead a remand of the entire case."  Conner v. Hall, 645 F.3d at 1294.

Accordingly, we **VACATE** the district court's judgment denying Burgess's habeas petition and **REMAND** the case to the district court for further proceedings consistent with this opinion.